IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WELLINGTON STUBBS, | : | CIVIL ACTION |
|           Plaintiff, | : | |
| | : | |
|       v. | : | |
| | : | NO. 10-3200 |
| MICHAEL NUTTER, EVERETT | : | |
| GILLISON, CITY OF PHILADELPHIA, | : | |
| BILL JOHNSON, TIM REDDICK, and | : | |
| CARY KING, | : | |
|           Defendants. | : | |
| | : | |

DuBOIS, J.                                                                                                                   January 27, 2012

**MEMORANDUM**

**I. INTRODUCTION**

In this case, plaintiff Wellington Stubbs alleges that defendants unlawfully forced him from his position as Chief Investigator for Philadelphia's Police Advisory Commission ("PAC"). According to plaintiff, defendants investigated his Philadelphia residency and then constructively discharged him because he had referred an individual to the press in a matter involving a complaint of illegal police conduct. Plaintiff asserts claims under 42 U.S.C. § 1983 against five individual defendants and the City of Philadelphia. Presently before the Court is defendants' Motion for Summary Judgment. For the reasons set forth below, the Court grants the motion.

**II. BACKGROUND**[1]

    A.    <u>The Parties</u>

Plaintiff Wellington Stubbs was employed by the PAC from March 12, 2002, to

---

[1] As required on a motion for summary judgment, the facts set forth in this Memorandum are presented in the light most favorable to plaintiff, the nonmoving party.

November 13, 2009. (Defs.' Statement Facts ¶¶ A-1, B-21.) In June 2004, he received a promotion and became the PAC's Chief Investigator. (Am. Compl. ¶ 14.) The PAC, which is part of the office of Philadelphia's Managing Director, "advise[s] the Managing Director and the Police Commissioner on policies and actions of the Police Department with the purpose of improving the ability of police personnel to carry out their duties, and to improve the relationship between the Police Department and the community." (Exec. Order No. 8-93 § 4(a), Mot. Summ. J. Defs. Mayor Michael Nutter, Deputy Mayor Everett Gillison, City of Philadelphia, Bill Johnson Tim Reddick & Cary King ("Defs.' Mot.") Ex. 7.) Among other duties, the PAC investigates citizen complaints regarding police misconduct. (Id. § 4(d).)

Defendant Michael Nutter is the Mayor of Philadelphia. (Defs.' Statement Facts ¶ A-2.) During the events at issue, defendant Everett Gillison was Deputy Mayor for Public Safety and had supervisory and budgetary authority over the PAC.[2] (Id. ¶ A-3.) Defendant Bill Johnson is Executive Director of the PAC and was plaintiff's direct supervisor there. (Id. ¶ A-4.) When the relevant events occurred, defendant Tim Reddick was Director of Fraud and Special Investigations in the City Controller's Office. (Id. ¶ A-5.) Defendant Cary King, an investigator in the City Controller's Office, assisted defendant Reddick with the residency investigation at issue in this case. (Id. ¶ A-6.) The City of Philadelphia is also a defendant. (Id. ¶ A-7.)

B. Facts

On December 8, 2008, plaintiff interviewed a confidential police informant named Ventura Martinez at the PAC office. (Id. ¶ B-5.) Martinez had filed a complaint with the PAC

---

[2]On October 19, 2011, defendant Nutter named defendant Gillison his new Chief of Staff. Press Release, City of Philadelphia, Mayor Nutter Announces Everett Gillison as Chief of Staff (Oct. 19, 2011), available at http://cityofphiladelphia.wordpress.com/2011/10/20/mayor-nutter-announces-everett-gillison-as-chief-of-staff.

stating that he "felt threatened by a police officer and a drug dealer with whom he had been working." (Id.) Martinez stated, inter alia, that police officer Jeffrey Cujdik had been taking money Martinez earned as an informant. (Martinez Interview Report, Defs.' Mot. Ex. 11 ("Martinez Interview Report") 4-6.) In exchange, Cujdik leased Martinez an apartment. (Id.) Cujdik allegedly threatened to "kill" Martinez if he told anyone about the arrangement. (Id. at 6.) Neighborhood drug dealers had also recently learned of Martinez's role as an informant, and Martinez feared for his safety. (Id. at 2-9.)

During the interview, plaintiff gave Martinez the contact information of Wendy Ruderman, a reporter for the Philadelphia Daily News. (Defs.' Statement Facts ¶ B-6.) Plaintiff testified that he did this because he believed Ruderman had "more contacts" than he did and thus might "be able to help [Martinez] and perhaps get him to witness protection." (Stubbs Dep. 33:3-5, Defs.' Mot. Ex. 12 ("Stubbs Dep.").) Martinez contacted Ruderman and gave her information that she used to write an award-winning series of articles about Philadelphia police corruption titled "Tainted Justice," which appeared in the Daily News beginning on February 9, 2009. (Defs.' Statement Facts ¶ B-9.)

Defendant Gillison learned of the articles in February 2009, when Ruderman requested his comments. (Gillison Dep. 47:1-15, Defs.' Mot. Ex. 3 ("Gillison Dep.").) The record before the Court does not explain how Gillison discovered plaintiff's involvement, but shortly after Ruderman contacted him, Gillison asked to meet with plaintiff and his supervisor, defendant Johnson. (Defs.' Statement Facts ¶ B-8.) Gillison told plaintiff that he "exercised poor judgment in referring Martinez to the Daily News reporter." (Id. ¶ B-10.)

Approximately eight months later, on October 20, 2009, the Controller's Office issued a

Special Investigations Report concluding that plaintiff had violated city residency requirements, failed to pay city wage tax, failed to disclose outside income, and used excessive undocumented sick leave. (Defs.' Statement Facts ¶ B-15.) Defendants Reddick and King, who had conducted the investigation, signed the Special Investigations Report. (See Special Investigations Report, Defs.' Mot. Ex. 14, at 10.) Defendants assert that the investigation began approximately three months before plaintiff spoke with Martinez, but plaintiff disagrees.[3] After the report was released, Gillison, Johnson, and plaintiff had another meeting, and at some point, Gillison told plaintiff he either had to resign or be terminated. (Defs.' Statement Facts ¶¶ B-17 to B-19.) On November 13, 2009, plaintiff notified Gillison via email that he was resigning from his position with the PAC. (Id. ¶ B-21.)

    C.    The Instant Action

On July 1, 2010, plaintiff filed his Complaint in this Court. By Memorandum and Order of August 30, 2010, the Court granted defendants' Motion to Dismiss in Part, see Stubbs v. Nutter, No. 10-3200, 2010 WL 3421015 (E.D. Pa. Aug. 30, 2010), and plaintiff filed an Amended Complaint. In the Amended Complaint, plaintiff asserts claims under Section 1983 against all defendants. Defendants have moved for summary judgment arguing that there is no genuine issue of material fact as to any of plaintiff's claims.

## III. LEGAL STANDARD

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and

---

[3] Because the Court does not reach the issue of causation, the Court does not discuss the conflicting evidence the parties presented on this point.

resolve all reasonable inferences in that party's favor." Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). After examining the evidence of record, a court should grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law" and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

**IV.    DISCUSSION**

The Amended Complaint, which is less than precise, asserts due process and First Amendment retaliation claims against the individual defendants under Section 1983. The individual defendants also treat it as including an equal protection claim. Further, plaintiff asserts a Section 1983 claim against the City based on a policy of retaliation for First Amendment–protected activity and/or a failure to train City officers in the protection of First Amendment rights. The Court addresses each claim in turn.

    A.    Due Process

Plaintiff withdrew his due process claim in his response to defendants' Motion for

Summary Judgment.  (See Pl.'s Opp'n Defs.' Mot. Summ. J. 36.)  The Court thus grants defendants' Motion for Summary Judgment as to that claim.

  B.  Equal Protection

Plaintiff included an equal protection claim in his original Complaint, averring that he was "a member of a protected class; in that he engaged in United States Constitutional First Amendment activity."  (Compl. ¶ 31.)  The Court dismissed that claim without prejudice by Memorandum and Order dated August 30, 2010, on the ground that plaintiff's allegation that he "engaged in United States Constitutional First Amendment activity" was insufficient to aver that he was a member of a class protected by the Equal Protection Clause.  In that opinion, the Court noted that plaintiff's so-called equal protection claim was a "'mere rewording of [his] First Amendment–retaliation claim.'"  Stubbs, 2010 WL 3421015, at *3 (quoting Iovinelli v. Pritchett, No. 06-C-6404, 2008 WL 2705446, at *20 (N.D. Ill. July 9, 2008)).

Plaintiff's Amended Complaint does nothing to cure the deficiencies of his original Complaint in this respect.  The introduction to the Amended Complaint uses the phrase "equal protection" in passing, (see Am. Compl. ¶¶ 2, 7), but there is no mention of such a claim in the body of the Amended Complaint.  Moreover, plaintiff did not respond to any of the equal protection–related arguments set forth in defendants' Motion for Summary Judgment.  Under such circumstances, the Court concludes that plaintiff has not asserted an equal protection claim in his Amended Complaint.

  C.  First Amendment Retaliation

Plaintiff also argues that defendants retaliated against him for referring Martinez to the press, speech that he contends is protected by the First Amendment.  The Court concludes, however, that the speech was not protected because plaintiff did not speak as a citizen.

In evaluating government employees' First Amendment retaliation claims, courts engage in a three-step analysis:

> First, the employee must show that the activity is in fact protected. Second, the employee must show that the protected activity "was a substantial factor in the alleged retaliatory action." Third, the employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct.

Hill v. Scranton, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

With respect to the first step, the determination whether an employee's speech is protected is itself subject to a three-prong analysis:

> A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have "an adequate justification for treating the employee differently from any other member of the general public" as a result of the statement he made.

Hill v. Borough of Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). The Court addresses only the first prong of the protected-activity analysis: whether plaintiff spoke as a citizen.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421. "[T]he 'proper inquiry' into what are an individual's official duties 'is a practical one'" that does not rely solely on his formal job description. Gorum v. Sessoms, 561 F.3d 179, 185 (3d Cir. 2009) (quoting Garcetti, 547 U.S. at 424). "[A] claimant's speech might be considered part of his official duties if it relates to 'special knowledge' or 'experience' acquired through his job." Id.

7

(quoting Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir. 2007)).  Further, the Third Circuit held that a public employee did not speak as a private citizen where "[i]t was through his position" that he was able to make the speech at issue.  Id. at 186.

The Third Circuit's decision in Kougher v. Burd, 274 F. App'x 197 (3d Cir. 2008), is particularly relevant to this case.  The Kougher plaintiff, a state dog warden, was notified of problems at an unlicensed kennel.  Id. at 198-99.  He filed animal cruelty charges against the operator of the kennel, but the state Bureau of Dog Law ordered him to withdraw the charges "based upon its position . . . that dog wardens lack the proper authority to file such charges."  Id. at 199.  A few months later, the plaintiff spoke to a newspaper reporter about the investigation "in spite of a policy that dog wardens refer all media inquiries" to their employer's press office.  Id.  The plaintiff received a one-day suspension for his unauthorized communication with the press.  Id.

The Third Circuit held that the plaintiff did not speak as a citizen when he spoke to the press about the animal cruelty investigation.  The court explained that the plaintiff's speech was "entirely job-related [because] his unauthorized contact with the press concerned matters related to his professional duties."  Id. at 201.  It did not matter that the communication was unauthorized; it sufficed that the communication was "'clearly within the scope of his professional duties as a state dog warden.'"  Id. (quoting Kougher v. Burd, No. 1:04-CV-2209, 2007 WL 216844, at *9 (M.D. Pa. Jan. 25, 2007)).  Other cases concerning unauthorized, but job-related, speech by public employees are in accord.  See, e.g., Cindrich v. Fisher, 341 F. App'x 780, 788 (3d Cir. 2009) (holding that a court filing by a government attorney was "pursuant to her official duties" even though unauthorized); Nixon v. City of Houston, 511 F.3d 494, 498-99 (5th Cir. 2007) (holding a police officer's statement to the media to be unprotected;

the fact that he "performed his job incorrectly, in an unauthorized manner, or in contravention of the wishes of his superiors [did] not convert his statement . . . into protected citizen speech").

In this case, plaintiff did not speak as a citizen when he gave Ruderman's contact information to Martinez. The Court concludes that plaintiff's contact with the press "concerned matters related to his professional duties." Kougher, 274 F. App'x at 201.

First, it is relevant, though not dispositive, that plaintiff was "on the job" when he made the speech at issue. See, e.g., Garcetti, 547 U.S. at 421; Grdinich v. Phila. Hous. Auth., No. 10-4954, 2011 WL 4467658, at *5 (E.D. Pa. Sept. 26, 2011). Part of plaintiff's job was to interview citizens who had filed police misconduct complaints with the PAC. (See Martinez Interview Report 3.) The speech occurred when Martinez came to the PAC office, during work hours, for such an interview. (Id.)

Second, plaintiff's purpose in referring Martinez to the press was related to his official duties. Plaintiff's uncontradicted testimony is that he hoped Ruderman would be able to "protect" Martinez. (Stubbs Dep. 33:3-5; see also Gillison Dep. 76:22-77:14 (explaining that plaintiff told Gillison he referred Martinez to Ruderman because Martinez was "in fear" and plaintiff "thought it was the right thing to do at the time").) City agencies, including the PAC, obtain protection for witnesses "on a regular basis." (Gillison Dep. 79:20-80:1.) That plaintiff may have gone about obtaining protection "incorrectly, in an unauthorized manner, or in contravention of the wishes of his superiors does not convert" his speech "into protected citizen speech." Nixon, 511 F.3d at 498-99.

Finally, plaintiff's speech arose from knowledge and experience he gained through his employment. He would not have been in a position to make such speech if not for his job as the PAC's Chief Investigator. See Gorum, 561 F.3d at 185; Armbruster v. Cavanaugh, No. 09-1006,

2010 WL 816385, at *4 (E.D. Pa. Mar. 9, 2010). Plaintiff testified that he met Ruderman and obtained her contact information through her professional visits to the PAC office. (Stubbs Dep. 33:7-10.) He had also "seen her in court several times." (Id.) Likewise, plaintiff's contact with Martinez arose "through his position" at the PAC, Gorum, 561 F.3d at 186, and he learned about Martinez's problems with Officer Cujdik through the PAC citizen-complaint process.

These factors compel the conclusion that plaintiff did not speak as a citizen when he referred Martinez to Ruderman. Because there is no genuine issue of material fact as to whether plaintiff's speech was protected, the Court need not analyze the other elements of plaintiff's First Amendment retaliation claim. The Court grants defendants' Motion for Summary Judgment as to plaintiff's First Amendment retaliation claims against the individual defendants and the City.

## V.    CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment is granted. An appropriate Order follows.